## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

## JOAO MANUEL PEREIRA DA FONSECA
### DOB: 12/20/1961

I, Robert Pinches, being first duly sworn, depose and state as follows:

## AFFIANT'S BACKGROUND

1.  I am a Special Agent of the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI"). I have served in HSI since December 2010, and have successfully completed criminal investigator training at the Federal Law Enforcement Training Center in Glynco, Georgia (FLETC). I am currently assigned to conduct investigations involving illegal exports and have successfully completed Counter-Proliferation Investigations Training course at FLETC. My current responsibilities include investigating the illegal transfer and export of commodities, information, and services from the United States, which are regulated by the United States Departments of State, Commerce, and the Treasury. I have received formal training in the laws and regulations relating to the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, and the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120 – 130, as well as the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C §§ 1701-1706, and the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560. I have conducted and participated in investigations of the above listed laws and regulations.

2.  I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, my review of emails, documentation, and publicly available information, and my conversations with other law enforcement officers. Where the actions, statements, and conversations of others are recounted herein, they are recounted in substance and part, unless otherwise indicated. Where the affidavit contains items in quotation marks, those quotations are based on agent notes and may not be completely verbatim. Because this affidavit is being submitted for the limited purpose of supporting a criminal complaint, I am setting forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested complaint. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

## PURPOSE OF AFFIDAVIT

This affidavit is in support of a criminal complaint charging JOAO MANUEL PEREIRA DA FONSECA ("FONSECA"), with Conspiracy to unlawfully export U.S.-origin goods to Iran, in violation of 18 U.S.C. § 371, that is, to export the goods without first having obtained the necessary export license, as required by the IEEPA.

## EXPORT CONTROL LAWS AND REGULATIONS

### IEEPA, ITSR and EAR

3.   IEEPA authorizes the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declares a national emergency with respect to that threat.  Pursuant to the authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

4.   Beginning with Executive Order No. 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and … declare[d] a national emergency to deal with that threat."

5.   On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 (collectively, the "Executive Orders"), and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.  The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions and Sanctions Regulations ("ITSR"), implementing the sanctions imposed by the Executive Orders.

6.   The ITSR generally prohibit any person from exporting or causing to be exported from the United States any goods, technology, or services without having first obtained a validated export license from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia.  The ITSR imposes, among others, the following prohibitions:

>   Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:
>
>   Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.
>
>   Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, Services to Iran or the Iranian Government:
>
>   Except as otherwise authorized [by a license issued by OFAC], the exportation, reexportation, sale, or supply, directly or indirectly, from the

United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a)  Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . .

Section 560.205 – Prohibited reexportation of goods, technology or services to Iran or the Government of Iran by persons other than United States persons;

Except as otherwise authorized pursuant to this part . . . the reexportation from a third country, directly or indirectly, by a person other than a United States person is prohibited if:

(1) Undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran; and

(2)  The exportation of such goods, technology, or services from the United States to Iran was subject to export license application requirements under any United States regulations in effect on May 6, 1995, or thereafter is made subject to such requirements imposed independently of this part.

7.  On October 15, 2007, the IEEPA was amended to include a criminal conspiracy provision and an increased fine.  Title 50, United States Code, Section 1705 provides in pertinent part:

(a)  Unlawful acts

It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter.

\*        \*        \*

(c)  Criminal penalty

A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both.

8.  IEEPA also empowers the U.S. Department of Commerce ("DOC") to issue regulations governing exports. Initially, the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, regulated the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the DOC promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contain additional restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA. See 15 C.F.R. § 730.02. Although the EAA lapsed on August 17, 2001, pursuant to the authority provided to the President under IEEPA, the President issued Executive Order 13222. In that order, the President declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the EAA. Accordingly, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have repeatedly signed renewals of the national emergency with respect to the EAA's expiration, the most recent being that of August 07, 2015 (80 Fed. Reg. 48,233 (August 11, 2015)). Under IEEPA, it is a crime to willfully violate any regulation promulgated thereunder, including the EAR. See 50 U.S.C. § 1705.

9.  Generally speaking, the EAR applies to goods, technology, and software that are "dual use" in nature, meaning that they have military and non-military uses. Among other things, the EAR prohibits the export of certain goods and commodities to specific countries, absent permission from the DOC issued in the form of an export license. Specifically, the DOC has devised the "Commerce Control List" (CCL), see 15 C.F.R. § 774, which consists of general categories of goods that are controlled for export and are so designated by an "Export Control Classification Number" (an "ECCN"). The DOC also has devised the "Commerce Country Chart," see 15 C.F.R. § 738. In the event that a commodity or good is on the CCL, then an exporter must consult the Commerce Country Chart to determine whether an export license from the DOC is required to export the CCL item to a given country.

**FACTUAL BASIS SUPPORTING PROBABLE CAUSE**

THE CONSPIRACY

Background

10. I know from my own training and experience, and the training and experience of law enforcement officers with whom I work, that individuals and companies attempting to circumvent United States export law, including the embargo against Iran, will arrange for the export of goods from the United States to countries where embargoes are not currently present or where companies are more likely to be approved for export licenses, such as Portugal, for transshipment to end-users in Iran.

11. As described below, FONSECA has conspired with an individual identified herein as "PV", owner of a Portuguese-based engineering company identified herein as "FEC"; and

an individual identified herein as "GG"; and an individual identified herein as "RR"; who works for a company identified herein as "KSP," which is located in Isfahan, Iran, to procure U.S. commodities for end-use in Iran, in violation of IEEPA.

12. Over the course of the criminal investigation, HSI-SD applied for and obtained federal search warrants enabling it to obtain electronic communications and related records involving the conspiracy.  In addition, HSI-SD conducted a border search on electronics possessed by FONSECA and his employee, identified herein as "SR," when they entered the U.S. on March 26, 2016.  A review of email communications and related business records revealed that FONSECA was a necessary and witting participant in the purchase and attempted export of U.S.-origin controlled technologies, for the benefit of FEC and KSP.

13. Over the course of the investigation, I learned that "RR" procures items requested by Iranian end users, whom he refers to as "engineers," and regularly uses "GG" as both a transshipper and procurer.  "GG" and his company, identified herein as "GG FTC" also has acted as a middle man between "PV" and "RR," though "RR" also deals directly with "PV."  "FEC" and "PV" are involved as a means to purchase US goods while obscuring the true end user and circumventing US export laws.

14. Though "FEC" often procures "off the shelf" items for "RR" that do not require any special training for use, sometime around 2014, "FEC" agreed to purchase high end technical equipment for "RR".  All of these machines required specific training from the manufacturers to use the systems.  Some of the machines required very specific set ups in order to properly use the machine, such as digging deep "piers" into the factory's flooring beneath the machine and filling it with various layers of substances to mitigate the vibrations given off by the machine.

15. The conspiracy involved the purchase of five machines by "FEC" at "RR"'s behest: two machines from German manufacturer Optotech, one of which is used for grinding lenses and the other which is used for polishing lenses; a Taylor Hobson Luphoscan machine, used for testing manufactured lenses; a 250 UPL machine manufactured by New Hampshire-based Moore Nanotechnology Systems ("Nanotech"); and a 2002PG machine manufactured by Ideal Aerosmith in North Dakota.  "FEC" agreed to purchase these items for "KSP," but would sell the machines at a significant mark up from what it cost "FEC" to purchase the items from the manufacturers.

16. In furtherance of the conspiracy, "KSP" funded the renting of a warehouse in Portugal, by "FEC", for the specific purpose of providing what would appear as a legitimate end use location for the machines being purchased.  As all the machines required complex installations, usually done by the manufacturer's engineers as part of the purchase and delivery of the machines, the warehouse was needed so as not to alert the manufacturers to the transshipment and true end use of their machines.

17. To ensure that "KSP's" clients received properly functioning machines, "FEC" would have the machines installed and calibrated in this warehouse.  "FEC" would test the

machines and record the results.  "FEC" would then break the machines down and ship them to "KSP" in Iran, either through Turkey or China.  "FEC" was then responsible for installing and calibrating the machines at "KSP's" end user locations.  The machines were required to go through the same testing done at "FEC"'s warehouse and were required to produce the same results to prove they had the proper calibration.

18. In order to help ensure that the machines could be properly set up in Iran after delivery, as part of the conspiracy, "RR" instructed "FEC" to place a covert camera in the rented warehouse, so the manufacturer's engineers installation could be recorded and provided to "RR"'s end users.

19. To facilitate the purchase, installation and use of these items, FONSECA, a trained electro-mechanical engineer, was responsible for providing engineering expertise and knowledge instrumental to the conspiracy.  Specifically, FONSECA was needed to attend training at the manufacturer's facilities in order to learn how to use, install and calibrate the machines.  FONSECA was responsible for then providing installation of the machines in Iran as well as providing the same training in the use of, and calibration of, the machines to Iranian engineers.

20. As part of the purchase agreement between "FEC" and "KSP," and at additional cost to "KSP," FONSECA agreed to provide the training he received on these machines on to the true Iranian end users, who, due to embargoes and licensing restrictions, never would have been allowed to receive the training on their own.

Initiation of the Conspiracy and Optotech Purchase

21. The investigation has revealed that FONSECA played a necessary role in the conspiracy by helping "FEC" and "KSP" to acquire German-manufactured Optotech machines in a complex transshipment scheme that would later be repeated to acquire U.S.-manufactured items in violation of the IEEPA.

22. A review of electronic communications and related records between the parties establishes that FONSECA, while working with "FEC" and "PV", advised "FEC" on Optotech machines "KSP" would need to produce high-end lenses and ultimately traveled to Iran to install the machines.

23. Prior to his trip to Iran, FONSECA received, via email, an invitation letter from "RR" and "KSP" with instructions to take the letter to the Iranian Embassy in Portugal to get his Visa.  FONSECA received tickets for travel from Turkey to Iran and returning to Portugal, from "GG", via email.

24. On June 15, 2014, FONSECA traveled to Iran to install the Optotech machines. FONSECA's trip included stopping in Turkey to meet with "GG", who accompanied him to meet with "RR" in Isfahan.  FONSECA was in Iran from June 15, 2014, through June 19, 2014, when he returned to Portugal, via Turkey.

6

25. In addition to this first trip, emails indicate a second trip for FONSECA was planned for late 2015 or 2016.  Emails referencing the planned trip include "RR" telling "PV" that FONSECA must hand-carry procured items from Portugal to Iran as well as statements by "RR" that FONSECA will receive payment, in cash, for procurements while in Iran.

<u>LuphoScan Purchase</u>

26. As part of the conspiracy, FONSECA arranged to receive training from Taylor Hobson engineers on a Luphoscan machine which "FEC" procured on behalf of "KSP."  FONSECA planned the training with "PV", including providing  to "PV" the costs of paying the Luphoscan engineers to train FONSECA.  FONSECA then received the training at the "FEC" warehouse in Portugal.  The training was recorded by a hidden camera, specifically installed by "FEC" so that it could covertly record the training so as to provide video of the training and installation to "KSP" in Iran, per "KSP" and "FEC's" agreement.

27. On or about February 2, 2015, FONSECA created an internet "cloud" space in which the Luphoscan training video and photos were uploaded, so that Iranian engineer end-users could access it and view the video and photos.  FONSECA passed the information needed to access this space, and the information that it contained the Luphoscan training, on to "PV", who passed it on to "RR".

<u>FIRST OVERT ACT AGAINST US LAW</u>

<u>Purchase and Training of Nanotech 250 UPL</u>

28. On October 17, 2015, FONSECA entered the US at the Boston Logan International Airport Port of Entry for the purpose of visiting Nanotech in New Hampshire.  FONSECA visited Nanotech in order to test the Nanotech machine to ensure that it met "FEC's" needs and to receive training on its use and calibration.  FONSECA's trip for the training lasted two weeks and he departed the US on October 31, 2015.

29. An email from "PV" to "RR" sent on October 27, 2015, states that "FEC" was being paid 43,347 Euros from "KSP" for the training received by FONSECA at the Nanotech factory.  The same email stated "FEC" was being paid 15,221.25 Euros by "KSP" for the training received at the "FEC" warehouse by the Luphoscan engineers and an additional 35,100 Euros by "KSP" for training on the Luphoscan to clients in Iran.

30. An October 27, 2015, email from "RR" to "GG" stated "KSP" had already paid approximately $788,000 for the Nanotech machine and "additional options."  Included in the costs for the Nanotech machine is $18,750 for installation in Isfahan, Iran.

31. On December 2, 2015, HSI contacted Nanotech regarding their sales to "FEC".  Nanotech provided HSI with documentation regarding the sale, including the Sales Order for the 250UPL.  "FEC" paid Nanotech  $411,300 for the machine, including the cost of training and installation at "FEC".

32. Nanotech confirmed that FONSECA and his employee, "SR" trained on their 250 UPL system in October 2015.  Nanotech also confirmed that their 250 UPL system works complimentary with the Luphoscan system, stating one would use the Luphoscan to test the lenses created by the 250 UPL.

33. On February 10, 2016, HSI requested the detainment of an outbound shipment of Nanotech's 250 UPL system, which was leaving JFK International Airport and bound for "FEC" in Portugal.

34. Nanotech's 250 UPL system required an export license from the U.S. Department of Commerce, Bureau of Industry Security ("BIS"), before it could be exported to Iran.  The system had an ECCN designation of 2B001, relating to machine tools and any combination thereof, for removing (or cutting) metals, ceramics or "composites", which, according to the manufacturer's technical specifications, can be equipped with electronic devices for "numerical control". According to the regulations, the specific reasons for requiring export control are to protect national security, and promote nuclear non-proliferation and anti-terrorism.

35. FONSECA later admitted that he provided training photos of the Nanotech machine to "KSP" in Iran, via the internet cloud space he initially created to transfer the photos and videos from the Luphoscan training.  He made this statement during an interview on April 3, 2016, which is described below.

### SECOND OVERT ACT AGAINST US LAW

#### Purchase and Training of Ideal Aerosmith 2002PG

36. On January 14, 2016, HSI contacted Ideal Aerosmith regarding possible sales to "FEC". Ideal Aerosmith provided HSI the sales order for the 2002PG system to "FEC", through Ideal Aerosmith's Spanish distributor, Alava Ingenieros ("Alava"), located in Madrid, Spain.  "FEC" was purchasing the 2002PG system for $341,175.00, which included training for "FEC's" engineers on-site at the Ideal Aerosmith facility.

37. Ideal Aerosmith's 2002PG system required an export license from BIS.  Ideal Aerosmith provided HSI with the BIS Export License D1034340, dated October 21, 2015.  The license authorizes Ideal Aerosmith, through Alava, to export one (1) 2002PG-28-TL-SR120 Two Axis Positioning and Rate Table System to the Ultimate Consignee, ""FEC", Engenharia e Sistemas" at Praceta das Descobertas no2, Loja A, Agualva Cacem 2735-095, Portugal.  The 2002PG system has an ECCN designation of 2B120, relating to motion simulators or rate tables (equipment capable of simulating motion), with certain specified characteristics.  According to the regulations, export control is required because the system can be used for missile technology and to promote anti-terrorism.

38. Ideal Aerosmith also provided HSI with a copy of the End-User Agreement, dated August 9, 2015, and signed by "PV" on behalf of "FEC," in which "FEC" agrees that it will not resell the equipment to any end user or destination prohibited by the laws of the United States.

39. As part of the investigation, investigators obtained an email dated May 23, 2015, sent from "RR" to "PV", in which "RR" asked "PV" to purchase the 2002PG machine for "KSP."  In the email, "RR" stated the system would be used for excavation calibration systems in oil and gas sites.  "RR" stated the price of the system is around $200,000.

40. Follow up emails regarding the purchase show that "RR" and "PV" agreed that "KSP" would pay "FEC" $500,000 for the 2002PG, not including the cost of training or installation.  The cost of training in the US, training and installation in Isfahan, Iran, and transportation costs would be paid separately by "KSP."

41. Emails show that in addition to traveling to North Dakota for the manufacturer provided training, FONSECA was involved in negotiating the cost of using Ideal Aerosmith's Spanish distributor, Alava Ingenieros, S.A., to purchase the machine.

42. On March 26, 2016, FONSECA entered the US at the Minneapolis/St. Paul International Airport Port of Entry in order to visit Ideal Aerosmith in North Dakota.  The purpose of FONSECA's trip was to test the Ideal Aerosmith machine to ensure that it met "FEC's" needs and to receive training on its use and calibration.  FONSECA's trip for the training lasted one week and he was scheduled to depart the US on April 3, 2016.

43. As part of his entry into the US, FONSECA was given a secondary inspection and interview. During the interview FONSECA asked if his employee, "SR", could join. "SR" joined the interview, which was conducted by HSI Special Agent ("SA") Pinches and Customs and Border Protection Officer ("CBPO") Steinmann.  To the extent possible, only FONSECA's statements are referred to below.  FONSECA understands and speaks English, and the interview was conducted in English, unless noted otherwise.

44. When asked why they were traveling, FONSECA said they were testing a machine. FONSECA stated the machine is "half million dollars" and that he needs to test the machine to make sure it can do what their company needs.

45. When asked what their occupations are, FONSECA  said that he is an electrical-mechanical engineer and "SR" is an electrical engineer. FONSECA said he works for "FEC".  FONSECA stated he is a consultant for "FEC" and that he is checking the machine for "FEC" and coordinating the purchase of an additional machine. FONSECA stated he and the owner of "FEC", "PV", are friends and regularly work together.

46. When asked what the machine is used for, FONSECA stated "most importantly for the Air Force, for example." FONSECA stated it is used for the electronics in the aircraft. FONSECA stated that the machine was used for the Air Force but that they were using it

for something else.

47. FONSECA stated "FEC" was using the Ideal Aerosmith system for the manufacture of a multiple lens camera, though FONSECA stated it could be used for other projects as well. FONSECA stated "FEC" was the end user and destination of the machine.

48. FONSECA stated that while he is at Ideal Aerosmith, he will test the machine on applications relevant to "FEC's" needs. If the machine passes all FONSECA's test, then he will sign off on it and "FEC" will purchase it.  FONSECA stated that if the machine passed inspection they would purchase another.

49. SA Pinches asked if the machine they are purchasing requires any licensing.  FONSECA stated that with all high technology they have to sign a confidentiality agreement. FONSECA stated that when buying or selling high technology, you sign to the government saying you will not copy the technology.

50. SA Pinches stated, "in the US we have, like, embargoes and stuff like that so the information can't go to Cuba, can't go to Iran, can't go to Syria, Sudan, whatever. You can't do that." FONSECA acknowledged he understood, and  said 'yeah' multiple times while SA Pinches was listing the countries.

51. FONSECA stated "high technology is always with this purpose."  FONSECA added that he is bound by professional agreements as well and if he violates them, he won't work anymore.

52. SA Pinches stated "Aside from a professional agreement, it's illegal to do it. You understand?" FONSECA stated "yeah" and acknowledged he understood.  SA Pinches asked if FONSECA thought that the technology they were training on, since it dealt with Air Force testing, was covered under these laws.  FONSECA answered "yeah." FONSECA then stated he believed it was technology that required permission.  SA Pinches asked if it required a license.  FONSECA acknowledged that it did.  SA Pinches asked if they had a license and FONSECA stated "yes."

53. SA Pinches stated "it violates US law if it goes somewhere else, obviously don't do that. That's separate from any contracts you write." FONSECA acknowledged that he understood.

54. SA Pinches stated "even stuff that isn't licensed can't go to Cuba. You understand that? Can't go to Syria or Iran." FONSECA indicated in the affirmative.

55. CBPO Steinmann stated there was a new rule for the Visa Waiver Program in which participants can't have traveled to certain countries within the last five years, including Syria, Sudan, Iran, and Somalia. FONSECA indicated that he had not traveled to the indicated countries.

56. Both "SR" and FONSECA were admitted into the US.

57. At the onset of the training, Ideal Aerosmith discussed the export license for the 2002PG and informed the participants, FONSECA included, that the training was also covered by the license and could not be shared with anyone not included on the license. FONSECA signed an end use statement stating he would not violate the terms of the license, including training.  The end user statement contains an acknowledgement that the equipment will not be used for nuclear applications, rocket systems, ballistic missile systems, space launch vehicles, sounding rockets, unmanned air vehicle systems, cruise missile systems, target drones or reconnaissance drones. The statement contains an acknowledgement that the equipment will not be used for chemical or biological weapons and that it will not be resold to any end user or destination that is prohibited by the laws of the United States.

58. During the training at Ideal Aerosmith, FONSECA had concerns about the machine calibration. He wanted to know the tools required for calibration and how to use the tools. Ideal Aerosmith explained that any movement of the machine required recalibration. Ideal Aerosmith explained that, typically, Ideal Aerosmith has engineers travel with the machine to do the installation and initial calibration. FONSECA stated he needed to know how to calibrate the machine himself for various reasons, including "FEC's" frequent moves; that it wouldn't be cost effective to pay an Ideal Aerosmith engineer to fly out to Portugal every time the machine needed calibration; FONSECA's pride as an engineer; and a lack of trust in Ideal Aerosmith.  FONSECA stated final payment for the system would only be given if he is comfortable calibrating the machine.

59. Ideal Aerosmith stated that at the conclusion of "FEC'"s training, on April 1st, Ideal Aerosmith agreed that it would offer FONSECA training on calibration in "FEC's" Portuguese lab at a later date.

60. On April 6, 2016, Ideal Aerosmith informed HSI that the 2002PG system can be used for military grade navigation devices, missiles and smart devices.

Second Interview with FONSECA

61. On March 26, 2016, when CBPO Steinmann asked FONSECA whether he had traveled to Iran during the previous five years, FONSECA said that he had not.  However, the evidence obtained from FONSECA's laptop, which had been detained for a border search, revealed emails that indicated FONSECA had in fact traveled to Iran in 2014. Because of that trip to Iran, FONSECA was not eligible to be admitted into the US on March 26, 2016, under the Visa Waiver Program.  By answering falsely, FONSECA gained admission into the US in violation of federal law.

62. On April 3, 2016, at approximately 9:30 pm, HSI SA Robert Pinches and SA Ryan Esgate interviewed FONSECA during a secondary outbound interview at the Minneapolis/St. Paul International Airport.

63. SA Pinches explained that lying was a violation of the Visa Waiver Program, and stated that lying to the US Government was a separate criminal charge.

64. At approximately 9:35 pm FONSECA, was read his Miranda rights and acknowledged that he understood them.  FONSECA waived his rights and stated he would talk to SA Pinches and SA Esgate.

65. FONSECA stated that two years ago "FEC" purchased two Optotech machines from the German manufacturer.

66. FONSECA stated he has made four trips for "FEC" in which he has trained on machines, or checked them. FONSECA stated the four trips were for the following:

67. About 3 years ago, roughly 2013, he traveled to Italy for some X-ray machines.

68. About 2 years ago, roughly 2014, he traveled to Germany, to Optotech, to train on two of their machines, one used for grinding lenses and the other for polishing lenses.

69. FONSECA stated they purchased a third machine from Germany, a Luphoscan machine, but for the training, the German engineers traveled to "FEC's" lab.

70. The third trip was to Nanotech in New Hampshire and the fourth was the current trip, during which he received training at Ideal Aerospace.

71. FONSECA stated the Optotech machines were for "FEC" and not for resale. FONSECA stated the Optotech machines were in "FEC's" lab.  FONSECA stated they were for manufacturing diffractive lenses.

72. FONSECA stated "FEC" purchased the Luphoscan machine from Germany.  FONSECA stated the Luphoscan was not for resale but was part of the development side of "FEC" and works with the Nanotech machine and the Optotech machines in manufacturing and testing lenses.  FONSECA stated that he did not need to travel to learn the Luphoscan machine.

73. FONSECA stated he checked the Ideal Aerosmith machine and approved the purchase on the condition that the company includes calibration training.  FONSECA stated Ideal Aerosmith said it would take three to seven weeks of training to learn the calibration, but FONSECA stated he only needed one week.

74. FONSECA stated he hasn't made any other work trips for "FEC", "yet." FONSECA stated he may return for the calibration training on the Ideal Aerosmith machine. FONSECA stated "FEC" would not purchase the Ideal Aerosmith machine unless they taught him how to calibrate it.  FONSECA stated he would need to calibrate the machine once a year.

75. FONSECA stated the Ideal Aerosmith machine costs a half million dollars.  When asked if it was better to let the Ideal Aerosmith engineer do the installation on such an expensive machine, FONSECA stated he does all the installations on the machines. FONSECA said they were surprised when the installation was not already included in the purchase price.

76. FONSECA stated he had not traveled to any other countries. FONSECA stated he has never been to the Middle East. Asked specifically if he had been to Iran, FONSECA stated "Iran, no." Asked again if he's been to Iran, FONSECA stated "no."

77. SA Pinches stated he saw an email on FONSECA's computer saying he has been in Iran. FONSECA paused and replied "No. This flight it's one, and, um, made it and I don't go because when I see where is the place I don't go." FONSECA said he traveled to Turkey to fix a machine, but when he arrived someone was waiting for him in Turkey and he was told he had to go to Iran but he did not go.

78. SA Pinches stated he saw text messages on his phone to "PV" saying FONSECA was in Iran. After a long pause FONSECA said he went to Iran. FONSECA said he went to Iran to fix an x-ray machine. FONSECA stated again it was to fix one of the Italian x-ray machines. FONSECA stated he didn't know the name of the man from Turkey he went with.

79. FONSECA stated it was the only time he went to Iran.  FONSECA stated he did not teach anyone anything when he went to Iran.  FONSECA stated it was the only time he worked with Iran.

80. FONSECA stated he went to Iran one time and lied about it to enter the US.  FONSECA stated he did not install any machines in Iran, he fixed a machine.  When asked what machines he's fixed, FONSECA stated he fixed the x-ray machine.

81. SA Pinches stated he saw an email on FONSECA's computer in which FONSECA priced out how much it would cost for him to go to Iran.

82. FONSECA asked if he needed a lawyer.  FONSECA stated it was said he could have a lawyer. FONSECA then asked again if he needed a lawyer and stated "You tell me if I need or not."

83. SA Pinches stated he couldn't advise whether or not FONSECA needed a lawyer. SA Esgate stated that if FONSECA didn't want to talk to him and SA Pinches, that's fine. SA Pinches stated "it's your choice. We can't tell you what to do."

84. SA Esgate stated "We can't tell you if you need a lawyer, you need to make that decision for you."

85. SA Pinches reiterated "So it's your choice, you can keep talking to us and you can be honest or if you feel you need a lawyer, then we stop talking here, but then we can't talk

at all. It's up to you: if you want to be honest and talk to us, you can talk to us; if you want a lawyer, you can have a lawyer. It's up to you."

86. FONSECA then stated "Clean slate. Clean slate." FONSECA then stated he installed the two Optotech machines in Iran.

87. FONSECA was asked if the Ideal Aerosmith machine was also going to Iran and if that's why he needed to know how to install and calibrate it. FONSECA stated "this I don't know, yet." SA Pinches asked "What do you think?" FONSECA leaned down and nodded his head stating "maybe yes. Maybe yes."

88. When asked if that this is why Ideal Aerosmith couldn't come and install it because it wasn't going to Portugal, FONSECA stated "Ideal yes, we make, our tool, yeah. The machine, after we make the things we need, after we make the things we need, then "PV" sells machine, yes." FONSECA stated that they use the machine then sell them because of how much money they cost. "We don't have money to buy nothing more."

89. SA Esgate went through the scheme of "FEC" purchasing these high end machines, using them to manufacture parts for their prototype lens, and then moving the machines on to Iran so "FEC" could purchase the next machine they needed. SA Esgate asked "Am I understanding that correctly?" FONSECA stated "Yeah."

90. FONSECA stated he put photos of the Nanotech machine in the cloud space. FONSECA stated he did so because "PV" told him."

91. FONSECA stated he asked "PV" if he would have to go to Iran after he checked the machines and "PV" said yeah. FONSECA said "PV" told him not to worry. FONSECA stated he is afraid he would have to go back to Iran. FONSECA then said he didn't know if the Ideal Aerosmith machine would go to Iran but shrugged his shoulders and said "but you understand, if the first go, yeah."

CONCLUSION

Based on the abovementioned facts, I submit there is probable cause to believe that FONSECA knowingly conspired to facilitate, and facilitated, the attempted export of, and transshipment of, controlled US technology (that is, the 2002PG-28-TL-SR120 Two Axis Positioning and Rate Table System manufactured by Ideal Aerosmith and the 250 UPL Ultra

Precision Machining System manufactured by Moore Nanotechnology Systems) to Iran, in violation of 18 USC § 371, the IEEPA, 50 USC §1705, and the ITSR, 31 CFR Part 560.

_____
Robert Pinches, Special Agent
Department of Homeland Security
Homeland Security Investigations

Subscribed and sworn before me TELEPHONICALLY this_____day of April, 2016.

_____
DEBORAH A. ROBINSON
United States Magistrate Judge